**RECORD NO. 12-2119**

In The

# United States Court Of Appeals
## For The Fourth Circuit

**DAWN V. MARTIN; MIGUEL GALLARDO,**

*Plaintiffs – Appellants,*

v.

**JOHANNES BRONDUM; LONG AND FOSTER
REAL ESTATE, INC.; LONG AND FOSTER COMPANIES;
PATRICIA KNIGHT, a/k/a Patricia Knight Lambert;
SUSAN HAUGHTON,**

*Defendants – Appellees,*

and

**LONG AND FOSTER REALTY; LONG AND FOSTER REALTORS,**

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
AT ALEXANDRIA**

———————————

**BRIEF OF APPELLANTS**

———————————

**Dawn V. Martin**
LAW OFFICE OF
  DAWN V. MARTIN
**1725 I Street, NW**
**Suite 300**
**Washington, DC  20006**
**(202) 408-7040**

*Counsel for Appellants*

*Gibson*Moore Appellate Services, LLC
421 East Franklin Street  ♦  Suite 230  ♦  Richmond, VA  23219
804-249-7770  ♦  www.gibsonmoore.net

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 12-2119        Caption: Martin, et al. v. Long and Foster Real Estate, Inc., et. al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Dawn V. Martin, Esquire
(name of party/amicus)

who is        a Co-Appellant        , makes the following disclosure:
        (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?  ☐ YES ☑ NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
       If yes, identify all such owners:

- 1 -

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: _Dawn V. Martin_      Date: _____10/10/12_____

Counsel for: _Appellant Dawn V. Martin, Esquire_

## CERTIFICATE OF SERVICE
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

I certify that on _____10/10/12_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Mikhael D. Charnoff, Esquire
1497 Chain Bridge Road, Suite 202
McLean, Virginia 22101

Susan Earman, Esquire
Friedlander, Friedlander and Earman
1364 Beverly Road, Suite 201
McLean, Virginia 22021

_Dawn V. Martin_
(signature)

_____10/10/12_____
(date)

07/19/2012
SCC

- 2 -

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No.  12-2119          Caption:  Martin, et al. v. Long and Foster Real Estate, Inc., et. al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Miguel Gallardo
(name of party/amicus)


who is _____ a Co-Appellant _____, makes the following disclosure:
     (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                                  ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____          Date: _____10/10/12_____

Counsel for: Appellant Miguel Gallardo

## CERTIFICATE OF SERVICE
*****************************

I certify that on _____10/10/12_____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

Mikhael D. Charnoff, Esquire          Susan Earman, Esquire
1497 Chain Bridge Road, Suite 202     Friedlander, Friedlander and Earman
McLean, Virginia 22101                1364 Beverly Road, Suite 201
                                      McLean, Virginia 22021

_____               _____10/10/12_____
     (signature)                            (date)

07/19/2012                    - 2 -
SCC

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT .........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ......................................2

STATEMENT OF THE CASE ..............................................................4

STATEMENT OF FACTS ..................................................................5

SUMMARY OF ARGUMENT ...............................................................14

ARGUMENT .............................................................................19

     STANDARD OF REVIEW ...........................................................19

     DISCUSSION OF ISSUES ..........................................................20

I.    The Trial Judge Erred, as a Matter of Law and Fact, by Granting Summary Judgment to Defendants on Plaintiffs' Fair Housing Act Claim ................................................................20

    A.    The Fair Housing Act does not Require a Plaintiff to Submit a Written Offer on a House after being Told that it is not For Sale ...................................................20

    B.    The Trial Court Erred, as a Matter of Law, by Requiring Plaintiffs  to Prove that Defendants "Mentioned" Race or National Origin to Establish a Case of Housing Discrimination ..........................................................23

C.    The Trial Court Erred, as a Matter of Law, by Holding that Words No Reasonable Juror Could Interpret References to Plaintiffs such as "Total Animals," "Lazy and Ignorant" and Other Derogatory Racially Stereotypical Terms,  as "Code Words" for Racial Animus ......................................................................25

D.    The Court Erred, as a Matter of Law, by Failing to Consider Defendants' Disrespectful and Unprofessional Treatment of Ms. Martin and Mr. Gallardo as Evidences Racial Animus ..........................................................29

E.    The Trial Court Erred, as a Matter of Fact, Adopting All Facts Alleged by Mr. Brondum on Nothing More than his Word, Contrary to Evidence of Record, Including Testimony by his own Agents ..................................30

    1.    Judge Trenga Erroneously Held that the House was not Available for Sale ...............................................30

    2.    Judge Trenga Erroneously Held that Defendants Told Ms. Martin and Mr. Gallardo that they Could Make an Offer on the House ...........................................34

    3.    Judge Trenga Erroneously Held that Defendants had a Legitimate, Non-Discriminatory Reasons for Lying to Ms. Martin and Mr. Gallardo about the Availability of the House for Sale because Ms. Martin was a "Difficult Tenant" ....................................35

    4.    The Judicial Finding by a Federal Judge that Mr. Brondum's Reference to Ms. Martin and Mr. Gallardo as "Total Animals" was Justified by a Legitimate, Non-Discriminatory Reason is Abhorrent, Baseless, and Must be Reversed .................36

    5.    Judge Trenga Erroneously Determined that Ms. Haughton did not Know the Race or National Origin of Ms. Martin or Mr. Gallardo Prior to this Lawsuit ..........................................................39

6.    Judge Trenga Erroneously Determined Ms. Knight did not Know that Mr. Gallardo Lived in the House until the February 25, 2011 Inspection ..............41

II.    The Trial Court Erred, as a Matter of Law, by Dismissing Plaintiffs' Common Law, Pendant Claims...........................................42

A.    The Trial Court Erroneously Dismissed Plaintiffs' Fraud Claim .......................................................................................42

B.    The Trial Court Erroneously Dismissed Plaintiffs' Defamation Claim ................................................................43

C.    The Trial Judge Erroneously Dismissed Plaintiffs' Intentional Infliction of Emotional Distress Claim .................45

D.    The Trial Judge Erroneously Dismissed Breach of Contract Claim .................................................................51

III.    Costs and Attorneys' Fees Should not be Awarded against Plaintiffs in Civil Rights Cases when they File Lawsuits in Good Faith, Based on the Facts and the Controlling Law .................51

A.    The Trial Court Erred by Holding the Issue of Taxing Attorneys' Fees against Plaintiffs in Abeyance ........................51

B.    The Trial Court Erred by Awarding Costs against Ms. Martin and Mr. Gallardo ...........................................55

CONCLUSION ......................................................................................56

REQUEST FOR ORAL ARGUMENT ...................................................57

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

iii

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases:**

*Aman v. Cort Furniture Rental Corp.*,
85 F.3d 1074 (3d Cir. 1996) ...................................................................25, 26

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................19, 31

*Ash v. Tyson's Food, Inc.*,
546 U.S. 454 (2006)................................................................................2, 25

*Batrouny v. Batrouny*,
13 Va. App. 441, 412 S.E.2d 721 (1991) ...............................................14, 42

*Beale v. Burlington Coat Factory*,
36 F. Supp. 2d 702 (E.D. Va. 1999) ...................................................... 23-24

*Bell Atlantic Corp. v. Twombly*,
127 S. Ct. 1955 (2007) ...............................................................................20

*Bond v. Blum*,
317 F.3d 385 (4th Cir. 2003) .....................................................................19

*Broom v. Biondi*,
17 F. Supp. 2d 211 (S.D.N.Y. 1997) ..........................................................29

*Burgess v. Bowen*,
466 Fed. Appx. 272,
2012 U.S. App. LEXIS 3300 (4th Cir. 2012)............................14, 23, 24, 25

*Cabrera v. Jakabovitz*,
24 F.3d 372 (2d Cir. 1994), *cert. denied*,
115 S. Ct. 205 (1994)..................................................................................24

*Carwile v. Richmond Newspapers, Inc.*,
196 Va. 1 (1954)..........................................................................15, 43, 44

iv

*Christianburg Garment Co. v.*
*Equal Employment Opportunity Commission*,
    434 U.S. 412 (1978)................................................................4, 18, 52, 55

*County of Suffolk v. Secretary*,
    76 F.R.D. 469 (E.D.N.Y. 1977)....................................................55

*Daniels v. Essex Group, Inc.*,
    937 F.2d 1264 (7th Cir. 1991) ....................................................26

*Dist. 28, United Mine Workers, Inc. v. Wellmore Coal Corp.*,
    609 F.2d 1083 (4th Cir. 1979) ............................................ 19-20

*Dual v. Cleland*,
    79 F.R.D. 696 (D.D.C. 1978) ......................................................55

*EEOC v. Great Steaks*,
    667 F.3d 510 (4th Cir. 2012) ....................................................4, 18, 52, 54

*Evans v. American Import Merchants Corp.*,
    82 F.R.D. 710 (S.D.N.Y. 1970)....................................................55

*Federated Stores v. Le*,
    324 Md. 71 (1991) ................................................................16, 46

*First National Bank v. Cities Services Co.*,
    391 U.S. 253 (1968)....................................................................24

*Fuste, M.D. et., al. v. Riverside Healthcare Association, Inc., et al.*,
    265 Va. 127 (2003) ................................................................15, 44

*Futrell v. J.I.*,
    Case No. 93 4049 (7th Cir. Oct. 20, 1994)................................25

*Galdamez v. Potter*,
    415 F.3d 1015 (9th Cir. 2005) ....................................................26

*Gantt v. Security USA, Inc.*,
    356 F.3d 547 (4th Cir. 2004) ................................................16, 45

*Gay v. Waiters' and Dairy Lunchmen's Union Local No. 30*,
    86 F.R.D. 500 (D.C. Cal. 1980)......................................................55

*Harris v. Jones*,
    281 Md. 560 (Md. 1977) ..............................................16, 45, 46

*Havens Realty Co. v. Coleman*,
    455 U.S. 363 (1982)................................................*passim*

*Kassem v. Washington Hospital Center*,
    513 F.3d 251 (D.C. Cir. 2008)..................................................46

*Manikhi v. Mass Transit Administration*,
    360 Md. 333 (Md. 2000) ....................................................16, 45

*Matarare v. Archstone Pentagon City*,
    2011 U.S. App. LEXIS 59585 (2011) ....................................23, 25

*Matsushita Electric Ind., Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................24

*McDonnell-Douglas v. Green*,
    411 U.S. 792 (1973)..........................................................23, 24

*McGinest v. GTE*,
    360 F.3d 1117 (9th Cir. 2004) ..................................................25

*Na'im v. Clinton*,
    --- F. Supp. 2d ----, 2009 WL 1743642 (D.D.C. June 19, 2009) .................26

*New York Times v. Sullivan*,
    376 U.S. 254 (1964)..................................................................43

*Nixon v. Majors*,
    2007 WL 4592277 (W.D.N.C. 2007) ..........................................46

*Pumphrey v. Stephens Homes*,
    1994 U.S. App. LEXIS 5072 (4th Cir. 1994).................14, 22, 23, 24

*Pumphrey v. Stephens Homes, Inc.*,
    1997 U.S. App. LEXIS 5500 (4th Cir. 1997)..........................2, 22

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)......................................................................14, 19, 23, 24

*Riordan v. Kempiners*,
    831 F.2d 690 (7th Cir. 1987) .......................................................26

*Schatz v. Rosenberg*,
    943 F.2d 485 (4th Cir. 1991) ......................................................19

*Smith v. Dameron*,
    12 Va. Cir. 105 (1987)..................................................................43

*Woodner v. Breeden*,
    665 A.2d 929 (D.C. Ct. App. 1995) ...........................................46

**Statutes:**

28 U.S.C. § 1291 .................................................................................1

28 U.S.C. § 1332 .................................................................................1

42 U.S.C. § 3601 *et. seq*..............................................................*passim*

42 U.S.C. § 3604(a) ...........................................................................20

42 U.S.C. § 3604(d) ....................................................................*passim*

42 U.S.C. § 3613(c)(2)........................................................................51

Civil Rights Act of 1964, Title VII..............................................*passim*

Civil Rights Act of 1964, Title VIII ............................................*passim*

**Constitutional Provisions:**

U.S. Const. Amend. V...........................................................................1

U.S. Const. Amend. XIV .....................................................................1

**Rules:**

Fed. R. App. P. 4(a) ...................................................................1

Fed. R. Civ. P. 12(b)(6) .............................................................19

Fed. R. Civ. P. 56(c) ..................................................................19

**Other Authorities:**

http://pressroom.longandfoster.com/Pages/31912_COMP_2011
     AnnualReport.asp .............................................................53

http://www.merriam-webster.com/dictionary/hatred .............................27

*Restatement of Torts*, Section 46 ...........................................46

http://www.washingtonpost.com/blogs/she-the-people/post/republicans-
     eject-delegates-for-assaulting-an-african-american-camera-
     operator-with-peanuts/2012/08/29/f61b3bb2-f23e-11e1-b74c-
     84ed55e0300b_blog.html .............................................27

## JURISDICTIONAL STATEMENT

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1291 and Fed. R. App. P. 4(a).  The District Court had subject matter jurisdiction of this matter pursuant to the Fifth and Fourteenth Amendments to the United States Constitution, and pendent jurisdiction over state claims, pursuant to 28 U.S.C. § 1332.

### Notice of Appeal

The Court issued a final order disposing of all claims on September 11, 2011.  Ms. Martin and Mr. Gallardo filed their Notice of Appeal on August 14, 2012 (JA 404)  The Court accepted the Notice of Appeal for filing on September 12, 2011.  (Dkt. 131) The parties participated in mediation on November 1, 2012. Mediation failed.  Since this appeal was filed, the District Court has taxed costs against Ms. Martin and Mr. Gallardo and is holding in abeyance Defendants' motion for attorneys' fees.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

### I.     Fair Housing Act

1) Is a house only "available for sale," within the meaning of The Fair Housing Act, 42 U.S.C. § 3604(d), when it is listed in the multiple listing service ("MLS"), or is it "available" when the owner has informed someone that *s/he* is willing to entertain offers on the house? (*Pumphrey v. Stephens Homes, Inc*., 1997 U.S. App. LEXIS 5500 at 6-7 (4th Cir. 1997))

2) In order to establish a claim under the Fair Housing Act, is a prospective buyer required to submit a written offer on a house, even when s/he is told that it is not for sale? (*Pumphrey; Havens Realty Co. v. Coleman*, 455 U.S. 363, 373 (1982)).

3)  Does a Court usurp the province of the jury by holding that a landlord's references to his tenants as "total animals," "a POS (piece of sh-t)," "lazy and ignorant," and similar terms cannot constitute evidence of racial animus? (*Ash v. Tyson's Food, Inc.*, 546 U.S. 454 (2006))

4) Where a landowner, property manager and listing agent conspire to take down a "For Sale" sign, expressly to prevent tenants, who are non-African-American and Hispanic, from learning that the house is for sale, does a Court usurp the province of the jury by making a factual finding that they concealed the sale of the house from the Plaintiffs for a non-discriminatory purpose?

5) Does a Court usurp the province of the jury by accepting as true factual assertions regarding the availability of a house and the condition of a house, based on the landowners' testimony alone, when that testimony is contradicted by photographs, testimony of nine other witnesses and the landowner's own actions?

### II.     Fraud:

Where a landlord and realty company falsely represent to tenants that the house they are renting is not available for sale, forcing them out of the house rather than entertain an offer from them, have they committed actionable fraud?

### III.     Defamation

Where a realty company lists a house for sale stating: "Nightmare tenant left the house a mess," could such a reference constitute a defamation claim?

## IV.    **Breach of Contract**

Where a landlord was obligated to return or credit the tenant's $3,600 security deposit, did the Court err by holding that she cannot address this issue unless and until Defendants attempt to collect on the judgment they obtained in Fairfax County District Court?

Where a landlord and a tenant agreed, in writing, to a mutual 60 Day Notice before terminating the tenancy, did the Trial Court err by holding this agreement was unenforceable because it was not in a new lease signed by both parties?

## V.    **Intentional Infliction of Emotional Distress**

Did the Court usurp the province of the jury by holding that a landlord and real estate company did not commit "outrageous" conduct where that conduct included:

1) forcing the tenants out of their home of seven and a half years, refusing to provide the 60 Notice to Vacate that the parties agreed to provide each other before terminating the tenancy;

2) falsely representing that the landlord was moving into the house to hide its availability for sale from the tenants;

3) harassing, insulting and making false accusations against the tenants during the pre-move out inspection of the house;

4) threatening tenants with an illegal "lock out" of their home if they did not vacate within the 28 days demanded in the deficient Notice to Vacate;

5) litigating a "holdover" action in housing court, based on a Notice to Vacate that the landlord's own counsel advised was deficient on its face because it allowed only 28 days to vacate;

6) making false claims of damages against the former tenant, in Fairfax County District Court regarding purported damages to the house and the costs of repairs;

7) withholding the tenant's rental history to a potential landlord to prevent her from renting another house in the complex; and

8) gratuitously advertising the house for sale in a manner designed to insult and demean the former tenants in their eyes of their former neighbors and others, i.e., "Nightmare tenants left the house a mess;"

9) other conduct intended to cause the former tenants severe emotional distress, lost income, harm to their health and the disruption of Ms. Martin's law practice.

## VI.    Attorney's Fees and Costs

In accordance with *EEOC v. Great Steaks*, 667 F.3d 510 (4th Cir. 2012), and *Christianburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412 (1978), should plaintiffs be taxed with Defendant's costs and/or attorneys fees in civil rights cases filed as "private attorneys general," in good faith, based on a reasonable interpretation of the facts and the prevailing case law?

## STATEMENT OF THE CASE

## Motions to Dismiss

On January 18, 2012, Judge Trenga dismissed Martin's and Gallardo's claims

of fraud, breach of contract, defamation and intentional infliction of emotional

distress (JA 94, 88-94), with prejudice.  He also accepted Defendants' argument that

the Fair Housing Act claim was deficient because it did not allege that the house was

sold to a White person (JA 91-92, 94), despite Ms. Martin's argument to the contrary

(JA 73-74).  The Court therefore dismissed Plaintiffs' *Amended Complaint*,[1] without

---

[1] The Court's September 11, 2012 *Memorandum Opinion* states that the Second Amended Complaint included claims of defamation, breach of contract and intentional infliction of emotional distress (JA 406, fn. 1); however, these claims were in the original Complaint (Dkt. 1) and Amended Complaint (JA 50-55)  They were dismissed on January 6, 2012, from the bench.  (JA 94, 88-92)  The original Complaint was amended only to properly name the corporate defendant, Long and Foster Real Estate, Inc., rather than its trade name "Long and Foster Realty."

prejudice, with leave to Amend to add this allegation.  *Id.*  Plaintiffs filed the *Second Amended Complaint*, alleging that Mr. Brondum sold the house to a White person (JA 124).

All Defendants moved to dismiss the Fair Housing Act claim in the *Second Amended Complaint*, making all of the arguments that the Court had rejected on January 18, 2012.  On February 10, 2012, from the bench, Judge Trenga denied all of the respective Defendants' *Motions to Dismiss* Plaintiffs' Title VIII claims. (Dkt. 87 at 7:2-21; # 40).

### Cross Motions for Summary Judgment

All three parties filed *Motion for Summary Judgment*, with *Statements of Undisputed Material Facts.*  On July 17, 2012, Judge Trenga granted both Defendants' respective *Motions for Summary Judgment* and denied Plaintiffs' motion on Plaintiffs' then remaining Fair Housing Act claim, orally, from the bench.  On September 11, 2012, he issued a Memorandum Opinion (JA 406) and Order granting summary judgment to Defendants.  (JA 432)

### STATEMENT OF FACTS

Plaintiff Dawn V. Martin, Esquire, is African-American.  Miguel Gallardo, her fiancé, is a Black Hispanic-American.  (Dkt. 107-2, ¶1)  Ms. Martin is a civil rights and personal injury attorney, in solo practice.   Her 30 years of practice includes 5 years as a Trial Attorney for the U.S. Department of Justice, Civil

Rights Bureau and 6 years as a Senior Attorney-Advisor/Special Assistant to a Commissioner at the U.S. Equal Employment Opportunity Commission, as well as working for two police departments.  (Dkt.  107-2, ¶2)

Mr. Gallardo is a computer systems technician for a Department of Defense contractor, as well as an armed federal security officer with high level security clearances.  (Dkt. 107-5 ¶1, 3)  He is also a college graduate, and a part- time paralegal with Ms. Martin's law firm, as well as a certified court translator/interpreter (Id., Dkt. 107-7 at 14-32)

For 7 1/2 years, through March 31, 2011, Ms. Martin and Mr. Gallardo resided the townhouse owned by Johannes Brondum and managed by Long and Foster Real Estate, Inc., through its Property Manager, Patricia Knight.  (Dkt.  107-2 ¶7)

As of 2009, Mr. Brondum had never met Ms. Martin, but he was so pleased with the first five and a half years of her tenancy that he urged Ms. Knight to obtain assurances for her continued tenancy, stating that the longer she stayed, the better it would be for him.  (Dkt. 107-14 at 20-22)  In Ms. Knight's words, Ms. Martin paid "top dollar" (Dkt.  107-14 at 14) for luxury four – level townhouse with three bedrooms, a recreation room/den, 2 1/2 bathrooms, a Jacuzzi, a fireplace and microwave.  (JA 220-226; JA 283-295)

Although no new lease was signed when the original lease expired in 2005, the parties agreed to continue the tenancy on a month to month basis, modifying the lease to mutually require 60 days' notice to end the tenancy (JA 271, 272); however, without any warning, on January 31, 2011, Ms. Knight served two conflicting notices to Ms. Martin, each of which Ms. Knight characterized as a "30 Day Notice to Vacate" (JA 197, 198) -- although they demanded that she vacate by "the end of February," which was only 28 days' notice. [2]  The first notice, served by e-mail, stated that Mr. Brondum was going to "reoccupy" the house.  (JA 197) The second notice, served in person, approximately an hour later, stated that Mr. Brondum was selling the house.  (JA 198)  Both of these notices violated the parties' agreement to provide 60 days notice before terminating the tenancy.

Immediately upon receipt of these notices, Ms. Martin left several messages for Ms. Knight's supervisor, Long and Foster Regional Manager, Paul Timpane. (Dkt. s107-2, ¶15; 107-4 at 115-116).   They spoke briefly and Mr. Timpane promised to get back to her to answer her question of whether the house was for sale.  (*Id*.)  When she did not hear from him, Ms. Martin called again.  *Id*.  Mr. Timpane then left a polite voicemail message apologizing for the 30 Day notice,

---

[2] Mr. Brondum's own counsel advised Ms. Knight that the Notices were facially defective and that filing a holdover action against Ms. Martin based on these notices risked dismissal; however, Ms. Knight insisted on filing the action anyway.  (Dkt.  107-18)

which he described as "quite alarming" for anyone, but stated that it was the owner's requirement and that there was no "wiggle room." (Dkt. 1-7-21 at 39-40)

Discovery revealed that, on January 25, 2011, Mr. Brondum had written to Knight expressly stating that "the tenant" could avoid vacating the house by making an offer it. (Dkt. 107-14 at 1) Instead of conveying this information to Ms. Martin and Mr. Gallardo, Ms. Knight *concealed* this information from them -- even while Ms. Martin was making repeated inquiries about the house, stating that she and Mr. Gallardo wanted to make an offer on it.

On February 17, 2011, after receiving no response from anyone at Long and Foster, Ms. Martin wrote to Long and Foster's President, Jeffrey Detwiler, to try to obtain an answer to her question of whether the house was for sale and, in if it was not, to arrange a reasonable move out date, in accordance with their agreement for 60 days' notice. (JA 189, 146-185) The letter specifically identified "Miguel Gallardo" as her fiancé, who was living with her and wanted to buy the house with her. (JA 148) In fact, Ms. Martin's letter states that she and Mr. Gallardo were previously approved for a joint mortgage of $440,000. (*Id.*)

Mr. Detwiler delegated the matter to Vice President, Joseph Amatangelo (JA 195) who discussed it with Mr. Timpane and Ms. Knight (JA 191); therefore, Ms. Knight knew that Ms. Martin's fiancé lived in the house and that he is Hispanic prior to her inspection of the house on February 25, 2011.

E-mails produced in discovery revealed that, on February 18, 2011, Mr. Timpane, *who had never met Ms. Martin or Mr. Gallardo or been in their home,* wrote to Mr. Brondum stating that Ms. Martin *probably could not afford the house.* (JA 276-277)  He added that Ms. Martin "is an attorney and also an extremely difficult person" (Id.)  Mr. Timpane also wrote to Ms. Knight, stating that Ms. Martin is a "nasty," "selfish," "aggressive" and confrontation[al]"  (Dkt. 107-25) He also said that the house would "probably" be "a mess" and Ms. Martin is probably "a self important slob."  (*Id.*)

Even after Mr. Timpane "poisoned the well" with derogatory, stereotyped and baseless  "predictions" about Ms. Martin's personality and ability to buy the house,  Mr. Brondum was willing to accept an offer from her on the house (JA 276)  Although Mr. Brondum responded to Mr. Timpane's assessment by stating that he did not want to deal directly with Ms. Martin (*Id.*), he apparently did not view any personality issues as an impediment to selling her the house.   Ms. Knight testified that, as of January 25, 2011, she understood that Brondum *was selling the house* (Dkt. 107-10 at 172-173); yet, she *deliberately* withheld this information from Ms. Martin (Id.), even after Mr. Timpane instructed her to so inform Ms. Martin.  (Dkt. 107-21 at 51-56)

Mr. Timpane's testified that he reached his "opinions" about Ms. Martin solely because she had asked for more than 30 days to vacate and wanted

clarification regarding whether the house was for sale so she could make an offer on it.  (Dkt. 107-21 at 82-101)  He admitted that he had never received any negative report regarding Ms. Martin's housekeeping, even though Ms. Knight inspected the house in 2007 (Dkt. 107-21 at 94)  Prior to receiving the January 31, 2011 Notice to vacate, Ms. Martin and Mr. Gallardo were current with the rent. (Dkt.  107-2, ¶ 12)

Mr. Timpane further admitted that he had never referred to any other tenant in such derogatory terms, as he had referred to Ms. Martin.  (Dkt. 107-21 at 95:16-100:13)  When reviewing Mr. Timpane's e-mails during his deposition, Mr. Amatangelo testified that Mr. Timpane's conduct was "unacceptable" for Long and Foster employees.  (Dkt. 107-28 at 66:8-13)

Ms. Martin had asked Long and Foster to send someone other than Ms. Knight to accompany Mr. Brondum to the scheduled February 25, 2011 inspection of the house (JA 149); however, Long and Foster sent Ms. Knight.   (JA 204)  When Mr. Brondum actually met Martin and Gallardo, on February 25, 2011, he told them that he was *not* selling the house because he needed to move into it himself for a job that he was starting in Virginia, within the next week.  (JA 206, Dkt. 107-2 ¶38; 107-5 ¶44)  He added that he would not even consider selling the house "in this market" and, in any case, he disagreed with Ms. Martin's estimate of the value of the house at $375-395,000.  (JA 208-209)  Mr. Brondum stated that, if

10

he ever did consider selling the house, he would never consider anything less than $440,000 (Dkt. 107-2 ¶39, 107-5 ¶44, 107-4 at 187-188)  Despite his statement that he was not selling the house,  he also referred Ms. Martin and Mr. Gallardo to Ms. Haughton for further discussion.  (Dkt. 107-2 ¶40, 107-9 at 76-77)  When Mr. Brondum and Ms. Martin were talking civilly, Ms. Knight interrupted by yelling, "He wants you out!  He wants you out!"  (Dkt. 107-33 at 282-283; 107-31 at 38-39, 107-4 at 187-188)[3]

On February 25, 2011, after Mr. Brondum and Ms. Knight left, Ms. Martin immediately e-mailed Ms. Haughton to further inquire about whether the house was for sale.  (JA 200-210)  She followed up with Ms. Haughton (JA 199-203) until she received Ms. Haughton's March 1, 2011 response stating that *Mr. Brondum was moving back into the house and "he is not interested in entertaining an offer for sale."*  (JA 199)   On the same day, Ms. Martin wrote to Mr. Amatangelo stating that they would vacate the house no later than April 1, 2011 (JA 62, subject heading); nevertheless, on March 15, 2011, Ms. Knight instituted a holdover action against Ms. Martin, with a court date of April 1, 2011.  (JA 214)

---

[3] Ms. Knight's former assistants, Conrad Perl and Waynette Cooke, both testified that they had never heard Ms. Knight speak to any tenant in such a rude manner. (Dkt. 107-33 at 33-36; 107-12 at 81-82), indicating that she did not speak to White tenants in this manner.

Ms. Martin and Mr. Gallardo applied for another rental in the same complex (Dkt. 107-36); however, Long and Foster withheld their rental payment history from the prospective landlord (*Id*.) so that their application was too delayed to allow them to secure the home before the April 1, 2011 court date set in the "holdover" action.  They therefore had to move quickly, into a totally different community, to another rental.  (Dkt. 107-2 ¶¶73-74, 107-5 ¶¶78-79)  Even though Ms. Martin and Mr. Gallardo had vacated the house on March 31, 2011, the Fairfax County District Court permitted Defendants to amend the holdover action to request *unspecified* damages to the house and they obtained a default judgment against Ms. Martin (in the wrong name), for over $9,000.00, including $2,500 in attorneys' fees.  (Dkt.  107-42)  Ms. Martin had filed an emergency motion for a continuance because her mother was scheduled for life-threatening surgery in New Jersey.  (Dkt. 107-44)  Mr. Brondum opposed the motion and the Court denied it. Ms. Martin attempted to vacate the judgment, but the Court would not hear her claims or defenses.  (Dkt. 113-7)

Three weeks after Mr. Brondum forced Ms. Martin and Mr. Gallardo out of the house, he placed on the market for $375,000.  (Dkt. 107-43)  After only one day on the market, Mr. Brondum, through Long and Foster, sold the house to a White couple, Robert and Michelle Saylor, for $375,000.  (Dkt. 107-37 at 38-59) The Saylors did not buy the house "cash," nor did they have financing at the time

12

of their offer; instead, they were permitted more than a month from the date of his offer to obtain financing to buy the house and to effect the closing on June 3, 2011. (*Id*.)

In e-mail correspondence with Ms. Haughton during April of 2011, Defendant Brondum used terms and phrases to describe Ms. Martin and Mr. Gallardo, including "total animals" (JA 279) a "POS" ("piece of sh-t") (Dkt. 107-37 at 7) and other derogatory terms that indicate that Defendants viewed them as *sub-human* and/or otherwise consistent with derogatory stereotypes about Black and Hispanic people.  Even in his deposition, Mr. Brondum used terms to describe them such as "lazy and ignorant."  (Dkt. 107-28 273:13-21)

Long and Foster's listing agent, Susan Haughton, adopted Mr. Brondum's reference to Ms. Martin as a "POS (piece of sh-t)" (Dkt. 107-37 at 15) and added her own insults, such as "nightmare tenant" (Dkt. 107-43), "she is a complete loser masquerading as someone who has something going for her" (JA 278-279), "the judge will have her committed" (107-37 at 14), and "if there were justice in the world, she would not be in it."  (JA 279)  Additional stereotypical derogatory statements made by Mr. Brondum and/or  Long and Foster agents were provided to the trial Court in several forms, including a chart summarizing them and stating how they constitute evidence of animus based on race and/or national origin.  (JA 434)

## SUMMARY OF ARGUMENT

### Fair Housing Act/Virginia Human Rights Act

The Supreme Court has long established that a jury can infer motive based on the circumstantial evidence of disparate treatment, with absolutely no evidence of racial slurs or references to the plaintiffs' race or national origin. *Reeves v. Sanderson*, 530 U.S. 133 (2000), *Burgess v. Bowen*, 466 Fed. Appx. 272, 2012 U.S. App. LEXIS 3300 at *9-11 (4th Cir. 2012); *Pumphrey v. Stephens Homes*, 1994 U.S. App. LEXIS 5072 (4th Cir. 1994), *Havens Realty Co. v. Coleman*, 455 U.S. 363, 373 (1982).

Despite this long-established controlling law, Judge Trenga erred, as a matter of law, by holding that Ms. Martin and Mr. Gallardo did not provide sufficient evidence of discrimination to allow the case to go to a jury because they did not make a written offer on the house after being told that it was not for sale. In addition, Judge Trenga erroneously concluded that, *as a matter of law*, the comments that Defendants made about Ms. Martin and Mr. Gallardo, such as "total animals" and "lazy and ignorant" *could not be* interpreted as "code words" for race or national origin. Judge Trenga usurped the province of the jury and further erred, as a matter of fact, by holding, *inter alia*, that the house at issue was *not* available for sale and that Defendants had legitimate, non-discriminatory, reasons for referring to Ms. Martin and Mr. Gallardo by all of the derogatory

14

names they used.  This judicial finding, by a federal judge, is not only wrong as a matter of law and fact, but it is unconscionable under the facts of this case and compels reversal.

### Fraud

Judge Trenga erred by dismissing Ms. Martin's and Mr. Gallardo's claims of fraud, breach of contract, defamation and intentional infliction of emotional distress.   Fraud is established by proving:  "'(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'" *Batrouny v. Batrouny*, 13 Va. App. 441, 443, 412 S.E.2d 721, 723 (1991).  Ms. Martin and Mr. Gallardo properly pled a case of fraud by alleging that the Long and Foster and Mr. Brondum falsely told them that the house they wanted to buy was not for sale and they relied on it, moving out of the house instead of making a formal, written offer on it.

### Defamation

*Carwile v. Richmond Newspapers, Inc.,* 196 Va. 1, 8 (1954).   A defamatory statement made be made "by inference, implication or insinuation," where opinions infer facts.  *Fuste, M.D. et., al. v. Riverside Healthcare Association, Inc., et al.,*  265 Va. 127, 129  (2003), *citing Carwile*, 196 Va. at 7.

Ms. Martin and Mr. Gallardo properly alleged a claim of defamation by alleging that Long and Foster listing agent Susan Haughton listed the property for sale, stating, gratuitously, "Nightmare tenants left the place a mess!" This statement infers underlying facts about Ms. Martin and Mr. Gallardo, the former tenants. Discovery revealed that Long and Foster agents Patricia Knight and Paul Timpane also defamed Ms. Martin and Mr. Gallardo to Mr. Brondum in e-mail correspondence clearly designed to "poison" Mr. Brondum against them so that he would not sell them the house.

### Intentional Infliction of Emotional Distress

Judge Trenga improperly dismissed Ms. Martin's and Mr. Gallardo's claim of intentional infliction of emotional distress. In order to prevail in a case of intentional infliction of emotional distress, a Plaintiff must show: 1) the conduct was intentional or reckless; 2) the conduct must be extreme and outrageous; 3) there must be a causal connection between the wrongful conduct and the emotional distress; and 4) the emotional distress must be severe. *Gantt v. Security USA, Inc*., 356 F.3d 547, 552 (4th Cir. 2004); *Harris v. Jones*, 281 Md. at 566. *Manikhi v. Mass Transit Administration*, 360 Md. 333, 366 (Md. 2000), citing *Harris v. Jones,* 281 Md. 560, 566 (Md. 1977); In *Federated Stores v. Le*, 324 Md. 71, 80 (1991).

Ms. Martin and Mr. Gallardo properly alleged outrageous conduct by the Defendants, which included lying to them about the availability of the house for sale, taking down the "For Sale" sign, expressly to conceal the sale from them, threatening an illegal eviction, filing a "holdover" action against Ms. Martin based on a defective Notice to Vacate, and in violation of their written agreement to provide 60 days' notice to terminate the tenancy. Defendants obtained a default judgment in Fairfax County District Court based on falsified filings (as proven in this litigation) and unreasonably refused to consent to Ms. Martin's motion for a continuance due to her mother's scheduled life-threatening surgery in New Jersey and harassing them during a home inspection, with false accusations, yelling at them and other disrespectful conduct.

### **Breach of Contract**

Judge Trenga erroneously dismissed Ms. Martin's breach of contract claim, stating that she could not assert her claim of the return of her security deposit unless and until Long and Foster attempted to collect from her on the default judgment it obtained against her in Fairfax County District Court. In addition, Judge Trenga held that her written agreement with Long and Foster that the tenancy could only be terminated upon 60 days' notice was unenforceable because it was not in a new lease, signed by both parties.

17

**Attorneys Fees and Costs**

Since this appeal was filed, the District Court has taxed costs against Ms. Martin and Mr. Gallardo and is holding in abeyance Defendants' motion for attorneys' fees.[4]  As this Court held in *EEOC v. Great Steaks*, 667 F.3d 510 (4th Cir. 2012), and the United States Supreme Court cases upon which it relied, including, *Christianburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, fees may not be assessed against plaintiffs in racial discrimination cases simply because the plaintiffs did not prevail.  Fees may only be awarded where the claim was frivolous, unreasonable, or groundless.  *Id.* at 422.  Ms. Martin and Mr. Gallardo acted in good faith, based on the facts and the controlling case law.  Their claims are not frivolous or unfounded; accordingly, even if this case is not reversed, they should not be taxed with Defendants' attorneys' fees or costs.

Awarding attorneys' fees and/or costs against civil rights plaintiffs who act as "private attorneys' general" would thwart the Congressional intent of the Civil Rights Act and have a chilling effect on both potential civil rights plaintiffs and their attorneys who would otherwise pursue meritorious civil rights claims.

---

[4] Neither Ms. Martin nor Mr. Gallardo was served with either the December 6, 2012 or January 7, 2013 Orders taxing costs against them.  Ms. Martin discovered them while writing this Brief.

# ARGUMENT

## STANDARD OF REVIEW

### Summary Judgment

The standard of review for a District Court's grant of summary judgment is a *de novo* review of the record, applying the same standards of law and fact that they the District Court was required to apply. *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003). Pursuant to Rule 56(c), a party is only entitled to Summary Judgment where "the evidence in the record shows that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Rule 56(c) requires that, for purposes of summary judgment, "the evidence of the non-movant is to be believed and all justifiable inferences drawn in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Summary Judgment should only be granted where "no reasonable juror" or "rational fact finder" could find in favor of the non-moving party. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148 (2000).

### Motion to Dismiss

The standard of review for a District Court's grant of a motion to dismiss the complaint, pursuant to Rule 12(b)(6), is also *de novo*. *Schatz v. Rosenberg*, 943 F.2d 485, 489 (4th Cir. 1991). The appellate Court construes factual allegations in the nonmoving party's favor, accepting them as true. *Dist. 28,*

19

*United Mine Workers, Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1979). The allegations must be specific enough to raise a right to relief "above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969.

## DISCUSSION OF ISSUES

I. <u>**The Trial Judge Erred, as a Matter of Law and Fact, by Granting Summary Judgment to Defendants on Plaintiffs' Fair Housing Act Claim**</u>

A. <u>**The Fair Housing Act does not Require a Plaintiff to Submit a Written Offer on a House after being Told that it is not For Sale**</u>

Ms. Martin and Mr. Gallardo alleged violations of the Fair Housing Act, 42 U.S.C. § 3601 *et. seq.*, particularly:

1)  42 U.S.C. § 3604(a) by refusing to negotiate with them for the sale of the house, at 5444 Chieftain Circle, Alexandria, Virginia, where they had been tenants for 7 1/2 years; and

2)  42 U.S.C. § 3604(d) by representing to them that the house in question was not available for sale, when it was, in fact, so available, as demonstrated by its listing and sale to a White couple.

20

Judge Trenga's conclusion that Ms. Martin and Mr. Gallardo failed to establish a *prima facie* case of housing discrimination because they did not submit a written offer to Ms. Haughton is fatally flawed, as a matter of law and fact.[5] Section 804(d) establishes an enforceable, statutory right to truthful information concerning the availability of housing. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982). A reasonable person would not force a written offer on a homeowner who says that his house is not for sale. Judge Trenga's decision to the contrary flies in the face of the language of the Fair Housing Act as well as the applicable case law. The Opinion cites no case law requiring a plaintiff in a Fair Housing Act case to submit a formal offer on a house that the seller and agent have specifically told the plaintiff is *not* for sale.

In *Havens*, the Supreme Court held that "testers," or persons testing for discriminatory practices, but having no actual interest in renting the property in question, have standing to sue the landowners who discriminated against them by representing that housing was unavailable, when it was, in fact, available. The high Court held that the indignity of being discriminated against, on the basis of race, and being deprived of one's statutory right to accurate information,

---

[5] During the July 17, 2012 hearing in which he announced his decision from the bench, Judge Trenga contradicted his own conclusion, *moments earlier*, that there was sufficient evidence to establish that the house was for sale and that Plaintiffs *did* establish a *prima facie* case. (JA 103)

irrespective of race, constituted a recognizable injury under the Fair Housing Act that entitled them to monetary damages.

In *Pumphrey v. Stephens Homes*, 1994 U.S. App. LEXIS 5072 (4th Cir. 1994), this Circuit's leading case on point, the jury made a finding of racial discrimination based *solely* on circumstantial evidence.  A sales agent told Mr. Pumphrey, an African-American, that a parcel of land that he inquired about was not available. 1994 U.S. App. LEXIS 5072 at * 2-4.[6]  A week later, White "testers" inquired about the same land and the same sales agent told them that it was available for sale. Id. at *3-4.  Neither the testers in *Havens* nor the plaintiff in *Pumphrey* ever made an offer on the property discussed -- nor was there any evidence of racial slurs or admissions of racial discrimination; accordingly, as matter of law, there is no basis for requiring Ms. Martin and Mr. Gallardo to produce such evidence to sustain their discrimination claims.

Just as in *Pumphrey,* the Defendants in the present case lied to the Ms. Martin and Mr. Gallardo, telling them that the house was not for sale.  In fact, in the present case, Defendants went so far as to take down the "For Sale" sign placed on the house *after they forced Ms. Martin and Mr. Gallardo to move out,* admittedly, to conceal the sale of the house from Ms. Martin.  (JA 280-282)

---

[6] *See also Pumphrey v. Stephen Homes, Inc.,* 1997 U.S. App. LEXIS 5500 (4th Cir. 1997) (punitive damages).

**B.     The Trial Court Erred, as a Matter of Law, by Requiring Plaintiffs  to Prove that Defendants "Mentioned" Race or National Origin to Establish a Case of Housing Discrimination**

In granting summary judgment to Long and Foster, *et al.,* Judge Trenga adopted the very argument made by the Defendants that he had previously rejected. Counsel for Long and Foster argued that a plaintiff cannot prove a Fair Housing Act case unless the seller of the house or his agents called them very specific, clear racial slurs, or written confessions of discrimination, produced in discovery, that the reason he would not sell to the Plaintiffs was their race and/or national origin. (Dkt. 87 at 4)

Judge Trenga flatly and properly rejected these arguments on January 18, 2012 and February 10, 2012.   In granting summary judgment to Defendants, Judge Trenga deviated from his own previous holdings and violated the controlling Supreme Court and Fourth Circuit case law, as well as the well established Fair Housing Act and general Civil Rights Act cases in other federal jurisdictions.

Most notably, the decision violates *Reeves v. Sanderson*, 530 U.S. 133 (2000), *Burgess v. Bowen*, 466 Fed. Appx. 272, 2012 U.S. App. LEXIS 3300 at *9-11 (4th Cir. 2012); *Pumphrey v. Stephens Homes*, 1994 U.S. App. LEXIS 5072 (4th Cir. 1994), *Havens Realty Co. v. Coleman*, 455 U.S. 363, 373 (1982)*; McDonnell-Douglas v.* Green, 411 U.S. 792 (1973); *Matarare v. Archstone Pentagon City,* 2011 U.S. App. LEXIS 59585 at * 59- (2011); *Beale v. Burlington*

*Coat Factory,* 36 F. Supp. 2d 702, 703 (E.D. Va. 1999), *citing Matsushita Electric Ind., Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *First National Bank v. Cities Services Co.,* 391 U.S. 253, 289 (1968). *See also Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994), *cert. denied*, 115 S. Ct. 205 (1994).

Discrimination cases under the Civil Rights Act of 1964, including Title VIII, "The Fair Housing Act," are most often established based on circumstantial evidence. Id.; *Pumphrey v. Stephens Homes*, 1994 U.S. App. LEXIS 5072. *See also* Title VII (employment discrimination) cases based on the same circumstantial analysis, *Reeves v. Sanderson* 530 U.S. at 147-148; *McDonnell-Douglas v. Green*, 411 U.S. 792.

Quoting *Reeves* extensively, in *Burgess v. Bowen*, 466 Fed. Appx. 272, 2012 U.S. App. LEXIS 3300 at *9-11 (4th Cir. 2012), this Court reiterated that the *McDonnell-Douglas* paradigm does **not** require the Plaintiff to provide *direct* evidence of racial discrimination to prove that the Defendant's purported legitimate, non-discriminatory reason for its conduct is pretextual and that the real reason for the conduct was racial discrimination.

> In *Reeves v. Sanderson Plumbing Prods. Inc*., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), the Supreme Court clarified that [HN3] a prima facie case of discrimination, combined with evidence from which a jury could conclude that an employer's proffered justification was false, supported an inference of discrimination sufficient to defeat summary judgment. In other words, a plaintiff is not required to provide additional evidence that race was the true reason for the employment decision.

466 Fed. Appx. at 277.  *Accord, Matarare v. Archstone Pentagon City,* 2011 U.S.

App. LEXIS 59585 at * 59 (2011).[7]

       **C.**    **The Trial Court Erred, as a Matter of Law, by Holding that Words No Reasonable Juror Could Interpret References to Plaintiffs such as "Total Animals," "Lazy and Ignorant" and Other Derogatory Racially Stereotypical Terms,  as "Code Words" for Racial Animus**

Although The Fair Housing Act does not require Plaintiffs to present direct

evidence of racial animus, such evidence does bolster the circumstantial evidence.

"[R]acially charged "code words" may provide evidence of discriminatory intent

by "send[ing] a clear message and carry[ing] the distinct tone of racial motivations

and implications." *Aman v. Cort Furniture Rental Corp*., 85 F.3d 1074, 1083 (3d

Cir.1996), quoted in *McGinest v. GTE*, 360 F.3d at 1117 (9th Cir. 2004).  "People

often use code words when making discriminatory remarks." *Futrell v. J.I.,* Case

No. 93 4049, slip op. at 9 (7th Cir. Oct. 20, 1994).

In *Ash v. Tyson's Food*, *Inc*., 546 U.S. 454 (2006), the Supreme Court held

that the word "boy," in certain contexts, can be a racial slur.  The words must be

assessed in their historical and present context to determine whether it is being

used to denigrate a person on the basis of race.   In *McGinest*, the plaintiff's

supervisor referred to him as a "drug dealer."  The Court held this reference to be a

---

[7] Even if the defendant alleges conduct by the plaintiff that is true, this does not mean that the defendant is not using the conduct as an excuse, or pretext for illegal discrimination. In *McDonnell-Douglas*, the plaintiff, Mr. Green, actually *did* participate in a "stall in," protesting working conditions.

"code word" or phrase referring to his race, Black. *Accord Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1273 (7th Cir. 1991).

Statements regarding an individual's personal appearance, work ethic or personality may infer racial hostility. *Na'im v. Clinton*, --- F.Supp.2d ----, 2009 WL 1743642, at *6 (D.D.C. June 19, 2009).

> ... [W]hile discriminatory conduct persists, violators have learned not to leave the proverbial "smoking gun" behind. As one court has recognized, "defendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it." *Riordan v. Kempiners,* 831 F.2d 690, 697 (7th Cir. 1987).

*Aman v. Cort Furniture Rental Corp.*, 85 F.3d at 1083. *Accord Galdamez v. Potter*, 415 F.3d 1015, 1026 n.6 (9th Cir. 2005).

Discovery revealed compelling evidence of discriminatory animus by Mr. Brondum and Long and Foster agents. The Defendants used the most dehumanizing words, terms and/or phrases to describe Ms. Martin and/or Mr. Gallardo -- including "total animals" (JA 279) a "POS" ("piece of sh-t") (Dkt. 107-37 at 7), "lazy and ignorant" (Dkt. 107-28 at 273) and other unconscionable terms.

Ms. Haughton wrote that Ms. Martin was a "complete loser, masquerading as someone who has something going for her" and went so far as to state that the world would be "a better place *if Ms. Martin "were not in it*," i.e., dead, or never born. (JA 279) Despite their education and professional credentials, Mr. Brondum thought of Ms. Martin and Mr. Gallardo as people who would

deliberately *steal* mail from the new owners of the house and/or *vandalize* the

house.  (Dkt. 107 at 348-352)  Mr. Brondum said:

> the amount of mold and grime throughout the house, especially the
> bathrooms and kitchen, was a level I have not seen in a third world
> country.

(Dkt. 107-___)

He also said that Ms. Martin "inflicted inconvenience on honest citizens

involved in this rental agreement."  (Dkt. 107-14 at 8-10)  Because these bizarre

comments are so numerous, Ms. Martin and Mr. Gallardo prepared a chart of most

of the derogatory references, with citations discussing their historical meaning.

(JA 434)  Deciphering the meaning of words requires examining the deeds that

accompany them.  The Defendants acted with disrespect, lies, concealment and

intense, irrational hostility: in other words, *hatred*.  Hatred is defined as

"prejudiced hostility or animosity."  http://www.merriam-

webster.com/dictionary/hatred.   During the 2012 Republican National Convention,

two participants threw food at an African-American woman journalist/camera

person, saying, "*This is how we feed the animals*."[8]  Across the nation, people

recognized the reference  to this Black woman as an "*animal*" to be a racial slur.

*Id.*  If a jury is permitted to hear the evidence in the present case, jurors would

---

[8] E.g., http://www.washingtonpost.com/blogs/she-the-people/post/republicans-eject-delegates-for-assaulting-an-african-american-camera-operator-with-peanuts/2012/08/29/f61b3bb2-f23e-11e1-b74c-84ed55e0300b_blog.html.

similarly understand Mr. Brondum's references to Ms. Martin and Mr. Gallardo as "*total animals*" as a racial slur.  Certainly, a "POS" is even more demeaning than the term "animal."

Defendants' intense *hatred* for people who paid them rent reliably for 7 1/2 years, is inexplicable on any rational basis.  A jury should be permitted to evaluate the meaning of those terms, collectively and cumulatively, in the context of this case, as well as their historical and cultural contexts.

Judge Trenga ignored most of the racially stereotypical comments made by defendants about Ms. Martin and Mr. Gallardo.  (See JA 434)

With respect to the comments he chose to address, he assessed them as if these derogatory statements were, in fact, *true*, and therefore justified by legitimate non-discriminatory reasons.  For example, Judge Trenga found that Mr. Brondum's written e-mail to Ms. Haughton referring to Ms. Martin and Mr. Gallardo as "*total animals*" was not racially motivated, but rather, was justified because *Mr. Brondum characterized* the house as "filthy" when they vacated it; however, Mr. Brondum's *characterization* of the house does NOT evidence of the actual condition of the house.  See Section E(1), below, for discussion of Judge Trenga's errors of fact with respect to the condition of the house.

**D.    The Court Erred, as a Matter of Law, by Failing to Consider Defendants' Disrespectful and Unprofessional Treatment of Ms. Martin and Mr. Gallardo as Evidences Racial Animus**

Courts have recognized that where a Defendant has treated prospective home buyers in a disrespectful manner that is inappropriate in this type of professional relationship, this conduct constitutes evidence of racial animus and discriminatory motive.  In *Broom v. Biondi*, 17 F. Supp. 2d 211, 223-229 (S.D.N.Y. 1997), an interracial couple, consisting of a Black man and White woman, were denied the right to sublet a condo.  The Board which denied them subjected them to disrespectful and rude treatment, amounting to an "interrogation," during the interview process and rejection, which made them feel "embarrassed," "demoralized," "humiliated" and "angry."  17 F. Supp. 2d at  223-224.  The plaintiff couple received an award of $230,000 in compensatory damages for emotional distress and $467,000 in punitive damages.

Despite Ms. Martin's and Mr. Gallardo's attempts to work out a reasonable move out date and an amicable end to the tenancy, Ms. Knight and Mr. Brondum insisted upon litigating a holdover action against Ms. Martin to obtain an eviction order.  Even during his deposition, Mr. Brondum was full of contempt for Ms. Martin and Mr. Gallardo.  He *twice* testified that he had not read anything that Ms. Martin had given him or otherwise written because he regarded anything she had to say as "dribble."  (Dkt. 107-28 at 205, 298-299)  Mr. Brondum interpreted Ms.

29

Martin's comment, "In my church, we believe that what blesses one blesses all" as a *threat*.  (Dkt. 107-28 at 221-224)

Since Mr. Brondum and Ms. Knight did not intend to offer Ms. Martin a new lease, there was no reason to berate her or Mr. Gallardo regarding whether he should have filled out an application 7 years earlier, whether the grilles on the deck worked or whether Ms. Martin performed legal work in her home.

## E.    The Trial Court Erred, as a Matter of Fact, Adopting All Facts Alleged by Mr. Brondum on Nothing More than his Word, Contrary to Evidence of Record, Including Testimony by his own Agents[9]

### 1.    Judge Trenga Erroneously Held that the House was not Available for Sale

Judge Trenga inconsistently held that:

1) the house was not available for sale (JA 19-20); and

2) the Defendants offered Ms. Martin and Mr. Gallardo an opportunity to make an offer on the house (JA 22).

Judge Trenga usurped the province of the jury by this crucial question of fact -- not a question of law.  It the province of the court to determine whether a party was "honest."  This is a credibility determination that must be made by a *jury*, based on the totality of the circumstances and the demeanor of the witness.

_____

[9] The word limit does not permit an analysis of all of Judge Trenga's errors of fact, but the material errors are discussed below.

Judge Trenga never made any attempt to reconcile his contradictory conclusions.  In addition, he violated his obligation to interpret the facts in the light most favorable to the Plaintiffs, for purposes of summary judgment.  See *Anderson v. Liberty Lobby*, 477 U.S. at 255.   Judge Trenga chose April 27, 2011 as the first date that the house became available for sale; however, there is no basis -- in fact or in law -- for the proposition that a house is not available for sale until it is listed in a multiple listing service.  A house is "available for sale" at any point that the owner indicates a willingness to entertain an offer on it.

Judge Trenga determined that Mr. Brondum and Long and Foster agents answered *honestly* when they told Ms. Martin and Mr. Gallardo that Mr. Brondum was *not* selling the house.  (JA 19-20)  Mr. Brondum claimed that he had planned to move in to the house himself, due to a job that was beginning in Virginia (JA 208, Dkt. 107-2 ¶38, Dkt. 107-5 ¶44, Dkt. 107-31 at 60).  Defendants claim that Mr. Brondum simply but "changed his mind" after Ms. Martin and Mr. Gallardo moved out; however, Mr. Brondum provided absolutely no evidence that he ever had a job, or a promise of a job, in Virginia or that he ever made any plans to move to Virginia since January of 2011.  Brondum conspired with Ms. Knight and Ms. Haughton to *take down the "For Sale" sign* -- expressly so that Ms. Martin would not see it (JA 280-282).  This conduct demonstrates that they were very *deliberately deceitful* with Ms. Martin or Mr. Gallardo about the availability of the house.

The evidence that the house **was** "available for sale," beginning on as early as January 25, 2011 and continuing until it was sold on April 30, 2011, is overwhelming.

1) On January 25, 2011, one month before Mr. Brondum met Ms. Martin and Mr. Gallardo, he wrote to Ms. Knight stating that he wanted the tenant to vacate the house by the end of February "**Unless the tenant makes an offer to purchase the property**." (JA 274)

2) On February 19, 2011, he emphasized to Ms. Knight, in underlined font: "I need to get the property on the market."  (JA 276)  He added that only planned to stay in the house until it was sold.  *Id*.

3)  Prior to February 23, 2011, Mr. Brondum had contacted Ms. Haughton, to act as his listing agent to sell the house.  (Dkt. 107-13 at 23-24)

4)  Mr. Brondum never did relocate to the Virginia/D.C. area after he forced Ms. Martin and Mr. Gallardo out of the house.  (Dkt. 107-28 at 46-48, 77-78, 132-135)

5)  Mr. Brondum continues to live at the same address in Canandaigua, New York where he lived in January of 2011.  (Id.)

6) Mr. Brondum's April 12, 2011 e-mailed Ms. Haughton, discussing his mortgage payoff and his decision not to make repairs, expressing his desire to get the house on the market before the "season" passes.  (Dkt. 107-37 at 10)

7)   In an April 18, 2011 e-mail to Ms. Haughton, Mr. Brondum's stated that he has a "right" to sell the house to whom he pleases and to "change my mind as needed." (Dkt. 107-37 at 14-15)

8)   None of the e-mail correspondence from Mr. Brondum to Ms. Haughton or Ms. Knight states that he needed to be in Virginia or even that he was living in Virginia.

9) On April 21, 2011, Mr. Brondum signed a formal contract with Ms. Haughton to list the house for sale.  (Dkt. 107-37 at 60)

10) On April 27, 2011, Ms. Haughton listed the house in the multiple listing service for $375,000 (Dkt. 107-43) -- which is $20,000 less than Ms. Martin told Mr. Brondum that she and Mr. Gallardo were willing to pay.

11) On April 29, 2011, Mr. Brondum accepted an offer on the house for $375,000, from to Robert and Michelle Saylor, who are White.  (Dkt. 107-37 at 43)

12) On April 30, 2011, the sales contract was ratified, to the Saylors.  (Dkt. 107-37 at 38-59)

13) On June 3, 2011, the sale of the house to the Saylors closed on June 3, 2011.  (*Id.*)

14)   Mr. Brondum testified that he always intended to keep, his house in Canandaigua as his home, close to his "aging parent."  (Dkt. 107-28 at 77-78, 134-135)

15) Mr. Brondum admitted that he did not intend to move his furniture from New York to Virginia, but intended to sleep on an inflatable mattress on the floor when he had contracts in the D.C. area, and even then, *only until the house was sold*. (Dkt. 107-28 at 132-135)

16) Mr. Brondum testified that he receives *per diem* to stay in hotels to perform the government contracts that he performs in the D.C. area (Dkt. 107-28 at 77-78) furthering confirming that the D.C. area was not his home nor did he have any intention of making it his home.

17) Mr. Brondum's  New York address is his "business address" as well as his home address, demonstrating that he was not moving to Virginia for a job. (Dkt. 107-28 at 133)

18)  On April 27, 2011, at Ms. Knight's suggestion, Mr. Brondum instructed Ms. Haughton to take down the "For Sale" sign in front of the house so that Ms. Martin would not see it.  (JA 280-282)

   2.   **Judge Trenga Erroneously Held that Defendants Told Ms. Martin and Mr. Gallardo that they Could Make an Offer on the House**

Judge Trenga also made a factual finding that Long and Foster agents told Ms. Martin that Defendant Brondum *would* entertain a formal, written offer.  The e-mail that Judge Trenga cited for this finding was from Mr. Amatangelo, who referred Ms. Martin to Ms. Haughton.  Mr. Amatangelo did not say that the house

34

was for sale.  In fact, he said that Ms. Martin would still have to vacate the house

by March 2, 2011, but noted that she was correct in saying that this move out date

would be moot if she and Mr. Brondum arrived at an agreement for the sale of the

house.  When Ms. Martin contacted Ms. Haughton, she responded Mr. Brondum

was *not* selling the house because he was moving into it.  (JA 199)  Mr.

Amatangelo's referral to Ms. Haughton was, therefore, *the bridge to nowhere*.  It

certainly cannot constitute *an opportunity to make an offer on the house.*

> In the words of Mr. Gallardo:

> I worked in that house cleaning the house, vacuuming in the midst of
> working three jobs to -- and paying the rent diligently for our seven-
> and-a-half years. And to tell us that we had to make an offer to a ghost
> -- who would we have made an offer to, Your Honor?

(JA 471)

### 3.    Judge Trenga Erroneously Held that Defendants had a Legitimate, Non-Discriminatory Reasons for Lying to Ms. Martin and Mr. Gallardo about the Availability of the House for Sale because Ms. Martin was a "Difficult Tenant"

Judge Trenga also determined that the Defendants told them that the house

was not for sale because they deemed Ms. Martin to be a "difficult tenant."

Defendants' very argument that *they did not want to sell the house to Ms. Martin*

because they deemed her a "difficult tenant" constitutes an *admission* that the

house *was available for sale* when Ms. Martin and Mr. Gallardo stated their

interest in it and that Defendants lied to them by stating that it was not available.

35

In a January 28, 2009 e-mail to Ms. Knight, Mr. Brondum stated that the longer Ms. Martin stays in the house as a tenant, *the better for him*. (Dkt. 107-14 at 22, 20) There was no contact at all between Ms. Martin and Mr. Brondum -- until February 25, 2011, when he "inspected" the house and met both Ms. Martin and Mr. Gallardo in person. In Ms. Knight's own words, Ms. Martin was paying "top dollar" in rent for the house. (Dkt. 107-14 at 14) Obviously, he did not regard Ms. Martin's "difficult tenant" as of 2009 -- when she had been a tenant in the house for nearly 6 years. Mr. Brondum did not change his view of Ms. Martin until he was "poisoned" against her by Mr. Timpane on February 18, 2011 ((Dkt. 107-14 at 26-27).

### 4. The Judicial Finding by a Federal Judge that Mr. Brondum's Reference to Ms. Martin and Mr. Gallardo as "Total Animals" was Justified by a Legitimate, Non-Discriminatory Reason is Abhorrent, Baseless, and Must be Reversed

The district court's judicial finding of fact, holding that there was justification for calling Ms. Martin and Mr. Gallardo "total animals" and accepting as fact Mr. Brondum's false accusation that they left the house "filthy" is worse than anything that Mr. Brondum or Long and Foster has done to them. It is essentially a finding that Ms. Martin and Mr. Gallardo *are* animals, or, conduct their lives *like animals*. It is a judicial finding -- made by a federal judge -- that they are less than human. It is a determination that portrays them in a

36

dehumanizing manner to their peers, their friends, their families, their clients, their

opposing counsel, potential creditors, landlord, potential sellers of homes,

employers and strangers -- and it does so *forever*, for posterity.  It is difficult to

imagine a more permanent means of defamation, in effect, yet not in law, with no

legal remedy.  This unconscionable, baseless and vicious purported finding of

"fact" is *abhorrent* and must be reversed.[10]

Judge Trenga failed to even *acknowledge* the photos of the house as Ms.

Martin and Mr. Gallardo left it (JA 220-268).  Ms. Martin and Mr. Gallardo also

provided numerous witnesses who described the condition of the house as clean

and Ms. Martin and Mr. Gallardo as neat, clean people.  These witnesses included

three attorneys, including the General Counsel for the Veteran's Administration (a

Presidential appointee) (Dkt. 122-2), an Administrative Law Judge (Dkt. 143-7)

and a Senior Attorney Advisor with the U.S. Equal Employment Opportunity

Commission.  (JA 204)  It also included a Professor at American University/award

winning author (Ms. Martin's daughter) (Dkt. 122-5) and a retired Department of

Justice Director of Personnel, who was also a realtor for 30 years. (Dkt. 122-3)

Even Long and Foster's own agents admitted that the house was left in at

least "broom clean" condition -- the standard in the real estate industry for the

---

[10] It also suggests that they raised their respective children in a "*filthy*" home --
a characterization that is contrary to everything about them and insults their entire
family.

condition of a house being sold.  (Dkt. 107=13 at 70-72, 110)  Mr. Amatangelo

characterized the photos of the house as depicting a house that had been "lived in"

with "nothing wrong with it."  (Dkt. 107-25 at 98)

Judge Trenga also ignored undisputed evidence that Ms. Martin hired a

reputable cleaning service, "The Maids," to clean the house on the day before the

February 25, 2011 inspection (JA 107-2 ¶66, 107-5 ¶70) or the photos of the

house, furnished, while Ms. Martin and Mr. Gallardo lived in it.  (JA 293-295)

Mr. Brondum found it objectionable that Ms. Martin had a desktop computer

instead of a laptop, that she had a desk in the recreation room/den, which he

misidentified as the living room and that she had diplomas hung on the wall over

the fireplace (Dkt. s107-28 at 250-252, 259-266)

Mr. Brondum made wild accusations that Ms. Martin and Mr. Gallardo

"trashed" the house, left it "filthy" and even "imagine[d]" that a purported dark

spot on the wall of a half bath that had not been painted in 12 years was "*fecal*

*matter*." (Dkt. 107-28 at 349)  Instead of recognizing that Mr. Brondum's

testimony was not credible or leaving that determination to a jury, Judge Trenga

adopted every allegation made by Mr. Brondum as truth -- despite overwhelming

evidence to the contrary and numerous inconsistencies and other credibility

problems with his testimony and his obvious peculiarities (which were particularly

evident in his deposition video, made available to the Court through a link to sendspace.com).

Defendants admitted that the major repairs/renovations that were needed to get the house ready for sale were that it needed to be painted ($4,500) and re-carpeted ($3,078), and other costs estimated to total $11,003.00 -- nearly $10,000 of which Defendants admit were the responsibility of the owner -- not the tenant. Dkt. 107-41)[11]

### 5.    Judge Trenga Erroneously Determined that Ms. Haughton did not Know the Race or National Origin of Ms. Martin or Mr. Gallardo Prior to this Lawsuit

Judge Trenga's factual determination that Ms. Haughton did not know the race or national origin of Ms. Martin or Mr. Gallardo is contradicted by the record. In a March 1, 2011 e-mail to Long and Foster Vice President Joseph Amatangelo, Ms. Martin specifically alleged discrimination by Long and Foster agents, based on race and national origin, identifying herself as African-American and Mr. Gallardo as a "Black Hispanic." (JA 62) In addition, on March 28, 2011, Ms. Martin wrote to Mr. Brondum's attorney, Ms. Earman, stating that she would file a cross-claim against Mr. Brondum and Long and Foster for discrimination based on race and national origin. (Dkt. 113-11 at 2) In an April 4, 2011 e-mail, Mr. Brondum told

---

[11] This number is almost identical to the amount of the default judgment that Mr. Brondum obtained against Ms. Martin in Fairfax County. (Dkt. 113-3) Ms. Knight's "final act" of animus against Ms. Martin was to maliciously saddle her with Mr. Brondum's expenses for renovations and repairs that were long overdue.

Ms. Haughton that he would forward her Ms. Martin's e-mail threatening the lawsuit "for a bitter laugh." (Dkt. 107-37 at 8)   Apparently, he did forward it to her, because, on April 5, 2011, Ms. Haughton commented on it , stating, *inter alia*, "bully for her and her legal dictionary." (JA 278-279)

Both Mr. Brondum and Ms. Haughton *mocked* Title VIII in defiance, and Ms. Martin for invoking it. In an April 18, 2011 e-mail, Mr. Brondum stated that he would be putting the house on the market for sale, and with respect to Ms. Martin's allegations of discrimination, he stated: "**it is my decision if I want to sell and to whom (and I can change my mind as needed)**" (Dkt. 107-37 at 14-15) Mr. Brondum, in effect, declared that he could refuse to sell the house to whomever he chooses -- *no matter what his reason for choosing not to sell to that person.*

Mr. Brondum's comment that he could change his mind "as needed" is an admission of pretext and an expression of his belief that he can feign changing his mind to defeat the statute. Ms. Haughton responded that his case is a "slam dunk" and that "the judge may have her (Ms. Martin) committed." (*Id.*) The e-mails that Ms. Haughton produced herself demonstrates that, as far back as early April of 2011, she knew that Ms. Martin was African-American, that Mr. Gallardo was Hispanic and that they were alleging discrimination in the sale of the house, based on their race and/or national origin. A jury could well infer she and Mr. Brondum had conversations by phone or in person, or that there were additional e-mails that

they did not produce, that demonstrated that Ms. Haughton knew their race and national origin even earlier than April 5, 2011. In any case, she clearly knew their race when she took down the "For Sale" sign, on April 27, 2011, to conceal the sale from them and when she otherwise concealed the sale from them while she was trying to sell it to other people.

**6.    Judge Trenga Erroneously Determined Ms. Knight did not Know that Mr. Gallardo Lived in the House until the February 25, 2011 Inspection**

Although Mr. Gallardo was not directly in contact with Ms. Knight, she was aware that he was living in the house with Ms. Martin. Ms. Knight recognized that Ms. Martin's household consisted of two people when she offered Ms. Martin a renewed lease in 2008 (Dkt. 113-3, 113-4) even though Ms. Martin had informed Ms. Knight that her daughter had moved out. (JA 272-273) In her February 17, 2011 letter to Mr. Detwiler, Ms. Martin specifically stated that her fiancé, Miguel Gallardo, lived with her in the house. (JA 148) Mr. Amatangelo shared this letter with Ms. Knight and Mr. Timpane, as evidenced by Mr. Timpane's February 18, 2011 e-mail to Mr. Brondum stating that Ms. Martin had copied all of the Long and Foster Executives on her letter. (JA 277) Not only was Ms. Knight clearly aware that Mr. Gallardo lived in the house, but none of the Long and Foster Executives or managers indicated that Mr. Gallardo was there in breach of the lease -- and certainly not "illegally."

41

Ms. Knight and Mr. Brondum both admitted that they may have been aware that Ms. Martin had a fiancé (Dkt. s107-28 at 225, 283-285 and 107-13 at 128-129). They further testified that they did not concern themselves with who was in her household. (*Id.*) In fact, Ms. Martin's daughter was 19 when she moved into the house and she was never required to sign the lease or submit an application for tenancy, although she was authorized to live in the house. (JA 136) Ms. Knight's claim that Long and Foster required all occupants in the house over the age of 18 to sign the lease is therefore false. In any case, none of this mattered at the time that the tenancy was ending and they wanted to buy the house.

## II.  The Trial Court Erred, as a Matter of Law, by Dismissing Plaintiffs' Common Law, Pendant Claims

### A.  The Trial Court Erroneously Dismissed Plaintiffs' Fraud Claim

On January 6, 2012, from the bench, Judge Trenga dismissed Plaintiffs' common law claim of fraud. (JA 94, 90-91) Fraud is established by proving: "'(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled.'" *Batrouny v. Batrouny*, 13 Va. App. 441, 443, 412 S.E.2d 721, 723 (1991).

Ms. Martin and Mr. Gallardo properly alleged Mr. Brondum and Long and Foster agents falsely told them that the house was not available for sale. JA 32, 51-53) They alleged that they relied on this statement and moved out, rather than

make an offer on the house that had been their home for 7 1/2 years.  (JA 41, 43)

They alleged that, three weeks after they were forced out of the house, Mr.

Brondum sold it.   (JA 26) Discovery only strengthened the bases for the fraud

claim,  providing overwhelming evidence that the house *was* for sale.  See Section

I, E(1), discussing their Fair Housing Act claim.  Defendants had no right to

dismissal.  In fact, based on the evidence produced in discovery, Ms. Martin and

Mr. Gallardo are entitled to summary judgment on their fraud claim.  At a

minimum, the claim should be heard by a jury.

**B.**    **The Trial Court Erroneously Dismissed Plaintiffs' Defamation**
**Claim**

On January 6, 2012, from the bench, the district court dismissed Plaintiffs'

defamation claim holding that the statements made by Defendants constituted

"opinions," which are not actionable as defamation (JA 91);[12] however, a

defamation claim should only be dismissed where the statement(s) in question

cannot be reasonably be interpreted as defamatory, based on the common meaning

and inferences of the statement.  *Carwile v. Richmond Newspapers, Inc.,* 196 Va.

1, 8 (1954).   A defamatory statement made be made "by inference, implication or

---

[12] The court did reject Defendants' argument that there is no cause of action
because Defendants did not refer to Ms. Martin and Mr. Gallardo by name in the
listing is contrary to the well established law of defamation.  (JA 91)  The Court
agreed with Plaintiffs that, where the circumstances allow people to readily
ascertain the identify of the persons referenced, without stating their names, the
claim is just as actionable as if they had been named.  *Smith v. Dameron*, 12 Va.
Cir. 105, 111 (1987); *New York Times v. Sullivan*, 376 U.S. 254, 358 (1964).

43

insinuation," where opinions infer facts. *Fuste, M.D. et., al. v. Riverside Healthcare Association, Inc., et al*., 265 Va. 127, 129 (2003), *citing Carwile*, 196 Va. at 7.

A statement by an employer that a person is a "bad employee" -- or a "nightmare employee" -- may be an opinion, but infers that the speaker knows facts underlying that opinion that justify it. *Id*. Ms. Haughton's gratuitous listing the house for sale, stating that "*Nightmare tenant left the house a mess*" is a statement that is *capable* of a defamatory meaning. Even if these words could be interpreted as "opinion," the "facts" inferred by this statement are that the former tenants of this house were filthy and/or vindictive people. It also suggests other undesirable behavior, such as failure to pay rent, dishonesty, threatening or other unruly conduct.

These derogatory statements would deter anyone who knew that Ms. Martin and Mr. Gallardo were the former tenants from renting to them or otherwise admitting them into their community. Particularly since Ms. Martin is an attorney and Mr. Gallardo is a computer technician employed by a Department of Defense contractor, a contract federal law enforcement officer with a high level government security clearance, as well as a paralegal for Ms. Martin's firm, a statement inferring that they conducted themselves in such an unprofessional and undignified manner, disregarding their own legal obligations to their landlord, damages them in

their professions, constituting defamation *per se*.  Ms. Haughton testified that this

was the only time she had ever listed a house making derogatory comments about

the previous occupants.  (Dkt. 145-152)  It was clearly included for no other

purpose than to cause Ms. Martin and Mr. Gallardo emotional distress, humiliation

and harm to their professional and personal reputations.  Ms. Martin and Mr.

Gallardo should been permitted to pursue their defamation claim and prove that

they did not leave the house "a mess" and that they were not "nightmare tenants."

### C.    The Trial Judge Erroneously Dismissed Plaintiffs' Intentional Infliction of Emotional Distress Claim

In order to prevail in a case of intentional infliction of emotional distress, a

Plaintiff must show: 1) the conduct was intentional or reckless; 2) the conduct must

be extreme and outrageous; 3) there must be a causal connection between the

wrongful conduct and the emotional distress; and 4) the emotional distress must be

severe.  *Gantt v. Security USA, Inc*., 356 F.3d 547, 552 (4th Cir. 2004).[13]  "The

extreme and outrageous character of the Defendant's actions may arise from his

abuse of a position of authority over him, or power to affect Plaintiff's interests."

*Harris v. Jones*, 281 Md. at 566.  *Manikhi v. Mass Transit Administration*, 360 Md.

333, 366 (Md. 2000), citing *Harris v. Jones,* 281 Md. 560, 566 (Md. 1977).  "The

extreme and outrageous character" of the conduct of the Defendant's actions may

---

[13] In *Gantt*, the jury awarded $2.25 million dollars in damages for the sole claim of intentional infliction of emotional distress.  Ms. Martin represented the plaintiff, Dominique Gantt.

arise from his abuse of a position of authority over him, or power to affect plaintiff's interests." *Harris v. Jones*, 281 Md. at 566, quoting *Restatement of Torts*, Section 46.

In *Federated Stores v. Le*, 324 Md. 71, 80 (1991), the Court permitted an employee to sue his employer for the intentional torts of false arrest, defamation and intentional infliction of emotional distress. The employee's supervisor had accused the plaintiff of stealing and detained the employee to investigate the accusations. The court found the embarrassment and emotional distress of being accused of being a thief, in the presence of co-workers, constituted severe emotional distress sufficient to support a claim.

In defining "outrageous," the court should consider the nature of the activity, the relationship between the parties, the duties of the parties, and the prevailing norms of society. *Woodner v. Breeden*, 665 A.2d 929, 935 (D.C. Ct. App. 1995). In *Kassem v. Washington Hospital Center*, 513 F.3d 251, 255 (D.C. Cir. 2008), the D.C. Circuit held that a plaintiff who was sexually harassed by her supervisor and/or retaliated against for opposing it, could sustain a claim of intentional infliction of emotional distress (IIED) in addition to Title VII. Such conduct violates public policy and constitutes "outrageous" conduct. *Id. Accord*, *Nixon v. Majors*, 2007 WL 4592277 at *5 (W.D.N.C. 2007).

In the present case, the trial court should have considered the nature of the landlord-tenant relationship and the power that the landlord and his/her agents have over the tenants -- the power to take away the very roof over their heads, to force them to relocate, to disrupt their employment, work and ability to fulfill other obligations, to cost them substantial amount of money and time to oppose efforts to unfairly extract money from them.  The landlord also has the power, through withholding rent records and providing negative references, to prevent the tenants from obtaining comparable alternative housing and also, to discredit them with their neighbors and/or potential landlords and creditors by maliciously obtaining a judgment against them based on fraudulent claims.

Ms. Martin and Mr. Gallardo alleged intentional acts by the Defendants that a reasonably juror could conclude were outrageous and intolerable in a civilized society, intended to cause Plaintiffs severe emotional distress, and did, indeed, cause such distress.  Defendants lied to Ms. Martin and Mr. Gallardo, stating that the house that they lived in was not for sale and that they could not make an offer on it, when it was, in fact, for sale and was both listed and sold for less than they had stated they were willing to pay for it, to force them out of their home of 7 1/2 years, for no legitimate reason.

Defendants filed a completely unnecessary "holdover" eviction proceeding against Ms. Martin on or about March 15th, 2011, although she had stated, on

March 1, 2011, in writing, that she would be out of the house by within 30 days of that date, since she had finally received a response to her question regarding the sale of the house and the answer was that the house was not for sale. (JA 62) Defendants were aware that Ms. Martin and Mr. Gallardo were making every attempt to move out because a prospective landlord requested their rental payment history -- and Long and Foster *withheld it* until Ms. Martin contacted their attorney and asked that she instruct her client to provide it. (Dkt. 107-36)

Defendants made false allegations against Ms. Martin, claiming that she left the house "a mess" and owed the landlord $11,370.00 in rent, repairs and attorneys' fees ($2,500.00, not itemized). They maliciously pursued these completely frivolous claims and took advantage of the scheduled surgery of Ms. Martin's mother, in New Jersey, to obtain a default judgment awarding Defendant Brondum the total amount of the fraudulently **$11,370.00** claimed damages. (JA Dkt. 107-42) Mr. Brondum and Ms. Knight -- as well as their counsel, Ms. Earman -- knew that this claim was fraudulent, as evidenced by Long and Foster's own May 5, 2011 admission, on its *Security Deposit Disbursement Form* issued to Ms. Martin, stating that she owed **$3,060.00** to the landlord for all rent owed, damages claimed and attorneys fees ($660.00). (Dkt. 107-42)

Ms. Haughton gratuitously defamed and insulted Ms. Martin and Mr. Gallardo by listing the house for sale, stating: "*Nightmare tenant left the property a*

*mess, owner says, just sell it!* (Dkt. 107-43)  Listing the house in this manner did not benefit Defendant Brondum and may even have lowered the price that he would have otherwise been offered on the house.  The only reason for listing the house in this manner was to humiliate and degrade Ms. Martin and Mr. Gallardo when their former neighbors and potential landlords read this characterization of how they left the house -- when, in fact, they left it completely vacuumed, swept, mopped, with all counters wiped clean and bathrooms scrubbed.  (JA 211; 220-268; Dkt. s107-2 ¶83; 107-5 ¶91; 107-4 at 217-220; 107-31 at 66-67, 63)

During what should have been a simple inspection of the house to determine what repairs and maintenance should be done after Ms. Martin and Mr. Gallardo vacated the house, on February 26, 2011, Defendants used this "visit" as an opportunity to gratuitously insult and yell at Ms. Martin and Mr. Gallardo.  (JA 204-210)  Ms. Knight threatened to put Ms. Martin's and Mr. Gallardo's belongings out on the street (an illegal eviction), without going through the eviction process through the Courts.  She also interrupted a civil exchange between Ms. Martin and Mr. Brondum to yell at Ms. Martin, "He wants you out!  He wants you out!"  (Dkt. s 107-2 ¶41; 107-5¶47; 107-33 at 282-282)

Ms. Knight yelled at Mr. Gallardo, shaking her finger at him and yelling, "He's living here il-le-gally!!  Il-le-gally!!"  (JA 205-206, 210, Dkt. s107-2 ¶46; 107-5 ¶52; 107-7 at 86-87; 107-31 at 32)  Contrary to Judge Trenga's factual

49

finding, Ms. Knight was well aware that Mr. Gallardo lived in the house prior to her arrival on that date; however, even if he had been living there in violation of the lease, it would certainly not be a violation of law, or a crime. The hostile, *screeching*, manner in which she said it indicated that she was accusing Mr. Gallardo of being *in the country* illegally. (*Id.*)

Mr. Brondum and Ms. Knight falsely and gratuitously accused Ms. Martin of running a commercial business out of the house, even though she has a D.C. office (JA 204-205; Dkt. 107-2 ¶51; 107-5 ¶56; 107-7 at 85-86; 107-31 at 26-27), and of storing trash on the deck (referring to two working grills, which Defendants falsely characterized as non-working, with no basis). (Dkt. s107-2 ¶ 54; 107-5 ¶59; 107-31 at 26)

This aggregate conduct -- constituting a pattern of harassment by a landlord against a tenant -- is extreme, outrageous and far outside of the norm in a civilized society. Ms. Martin and Mr. Gallardo alleged that Defendants' conduct did indeed, cause them severe emotional distress and provided specific examples of the emotional harm that it caused them, including the physical harm that this emotional distress caused Ms. Martin, raising her blood pressure to dangerously high levels. (Dkt. 107-7 at 115, 124-130, 205) Plaintiffs allegations are therefore sufficient to sustain a claim of intentional infliction of emotional distress.

### D.    The Trial Judge Erroneously Dismissed Breach of Contract Claim

Judge Trenga acknowledged that Ms. Martin was entitled to the return, or credit, of her security deposit of $3,600.00 from Mr. Brondum and/or his Long and Foster agents; however, he stated, without explanation, that she could only maintain an action against the Defendants to collect it when they acted on default judgment that Mr. Brondum had obtained against her in Fairfax County Court, in the holdover action.  (JA 79-80, 89)

Judge Trenga dismissed Ms. Martin's claim that Defendants breached their contract with her by serving her with a 28 day notice to vacate (JA 89-90), even though she and Ms. Knight had agreed, in writing, to a mutual 60 day Notice to terminate the tenancy.  JA 271-272)

### III.    Costs and Attorneys' Fees Should not be Awarded against Plaintiffs in Civil Rights Cases when they File Lawsuits in Good Faith, Based on the Facts and the Controlling Law

### A.    The Trial Court Erred by Holding the Issue of Taxing Attorneys' Fees against Plaintiffs in Abeyance

Defendants seek the sanction of attorneys' fees against Plaintiffs, pursuant to the fee shifting provision of the Fair Housing Act, Title VIII of The Civil Rights Act of 1968, 42 U.S.C. § 3613(c)(2).  This issue is related to the costs that were taxed against Ms. Martin and Mr. Gallardo, discussed below.  Both issues will be moot if this Court reverses the grant of summary judgment on Ms. Martin's and Mr. Gallardo's Fair Housing Act claim and/or the dismissal any of their common

law claims.  Costs have already been taxed against them and the threat of astronomical attorneys' fees looms over their heads, like the sword of Damocles. Defendants' motion should have been summarily denied, from the bench.  It is itself, frivolous and vindictive.

As this Court held in *EEOC v. Great Steaks*, 667 F.3d 510 (4th Cir. 2012), and the United States Supreme Court cases upon which it relied, including, *Christianburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, fees may not be assessed against plaintiffs in racial discrimination cases simply because the plaintiffs did not prevail; nor is the fact that the simple fact that the defendants prevailed evidence that the plaintiffs pursued the case in bad faith. In *Great Steaks*, this Court said:

> ... the Supreme Court held in *Christiansburg Garment* that prevailing defendants may obtain attorneys' fees in a Title VII action only if the district court "finds that [the plaintiff's] claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Id.* at 422.

667 F.3d at 516.

On July 19, 2012, when Judge Trenga granted summary judgment to the Defendants, he prefaced his Order from the bench by stating:

> the court doesn't question for a moment the sincerity of the beliefs held by any of the parties in this case, including the sense of offense taken by conduct by -- that I've read in these pleadings.

(July 19, 2012 Hearing at 101:14-17)  This finding issue should be dispositive of Defendants' motions for fees; however, Judge Trenga has placed this motion in abeyance, awaiting this Court's decision on appeal.  The inference is that he will assess attorneys' fees against Ms. Martin and Mr. Gallardo is this case is not reversed.  This would set this case in motion for another appeal to this Court.

Long and Foster Companies in its real estate, mortgage lending, insurance and settlement activities reported a sales volume of $42.7 billion in 2011, $22 billion for Long and Foster Real Estate, Inc.  Long and Foster Real Estate, Inc., with its 180 offices, 12,000 agents and 69,000 reported real estate transactions represent an enormous market force;[14] yet, Long and Foster seeks $66,842 from Ms. Martin, a solo practice, civil rights attorney, and Miguel Gallardo, a computer technician and federal security officer, with a son.  (JA 469)  In a separate motion, Defendant Brondum seeks $38,442.50 against both Ms. Martin and Mr. Gallardo. If Defendants' motions were granted, therefore, the Court would be assessing $105,284.50 against Ms. Martin, $38,442.50 of which would be against Ms. Martin and Mr. Gallardo jointly and severally.

If Ms. Martin and Mr. Gallardo are required to pay either of the Defendants' litigation costs and/or attorneys' fees, in addition to their own litigation costs, it would have a "chilling effect" on civil rights plaintiffs and attorneys throughout

---

[14] Long and Foster Real Estate, Inc. Annual Report, http://pressroom.longandfoster.com/Pages/31912_COMP_2011AnnualReport.asp.

the country.  Both civil rights plaintiffs and their attorneys would have to fear financial destruction and/or bankruptcy in the filing of virtually any civil rights claim.  Few plaintiffs' attorneys could withstand even losing one case, with substantial discovery costs, if they had to pay the Defendants' litigation costs as well as their own, in addition to working on the case "for free" for what is often years.

The practice of law is not an exact science.  Even when the law appears to clearly compel a certain result, no plaintiff or attorney can be assured success in any litigation – – in fact, it is unethical for an attorney to guarantee any particular result. The fact that different judges view the same facts and law differently and that trial courts are often reversed on appeal -- and even reversed again upon appeal to a higher court, such as the United States Supreme Court.

Awarding defendants' fees in such cases would essentially close the courthouse doors on most civil rights plaintiffs; it would lock them out and *swallow the keys*.  As discussed below, *EEOC v. Great Steaks*, 667 F.3d 510, the controlling Fourth Circuit law, as well as long-established Supreme Court, prohibit such a result.

54

**B.    The Trial Court Erred by Awarding Costs against Ms. Martin and Mr. Gallardo**

The District Court has taxed Defendants' costs, of $10,786 against Ms.

Martin and Mr. Gallardo (JA 413).  District courts have specifically adopted the

*Christianburg* rationale to deny Title VII defendants not only attorneys' fees, but

also costs.  *Evans v. American Import Merchants Corp.*, 82 F.R.D. 710 (S.D.N.Y.

1970) and *Dual v. Cleland*, 79 F.R.D. at 697; *Gay v. Waiters' and Dairy*

*Lunchmen's Union Local No. 30*, 86 F.R.D. 500, 504 (D.C. Cal. 1980).  In *County*

*of Suffolk v. Secretary*, 76 F.R.D. 469 (E.D.N.Y. 1977), the court set forth factors

that should be considered, in the exercise of judicial discretion, to determine

whether costs should be awarded in a case of public law litigation: 1) whether the

action was brought and carried forward in good faith; 2) whether the prosecution of

the action provided direct benefits to the public; 3) whether the action resulted in

direct or indirect benefit to the defendant; 4) whether novel and substantial issues

of law or fact were resolved; 5) whether costs were required to reimburse needy

defendants; 6) whether costs would unduly burden non-affluent plaintiffs; and 7)

whether the imposition of costs would unduly inhibit future similar challenges.

This was a simple situation where a landlord wanted to sell his house and the

tenants wanted to buy it.  Against his own financial interests, Mr. Brondum

allowed Patricia Knight and Paul Timpane to play upon his own racial prejudices

and withhold the house from Ms. Martin and Mr. Gallardo for sale.  Even after Mr.

Amatangelo's proclamation that Mr. Timpane's derogatory e-mail about Ms. Martin e-mail to Mr. Brondum constituted "unacceptable behavior" Long and Foster offered no apology. At a minimum, Long and Foster should pay its own litigation costs and hold it and its agents accountable for what its own Vice President admits is "unacceptable" behavior.

If this case had been frivolous, Judge Trenga should have granted Defendants' motions to dismiss the Fair Housing claim. Then Ms. Martin and Mr. Gallardo would not have incurred the expense of more than $20,000 in depositions, hundreds of dollars in photocopying an binders and suffered substantial lost income due to time spent in discovery. In addition, it would have saved nearly all of Defendants' costs that were taxed against Ms. Martin and Mr. Gallardo and most of Defendants' attorneys' fees that they currently seek in the motion that Judge Trenga now holds in abeyance, like the "sword of Damocles" over the heads of Ms. Martin and Mr. Gallardo.

## CONCLUSION

Ms. Martin and Mr. Gallardo respectfully request that this Court reverse the judgment of the trial court, restore their dismissed claims and grant them summary judgment on their claims of violations of the Fair Housing Act and fraud. They also respectfully request that the case be remanded to a judge other than Judge Trenga for trial on their remaining claims and damages.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Counsel for Appellants respectfully requests oral argument.

Respectfully submitted,

<u>/s/ Dawn V. Martin</u>
Dawn V. Martin, Esquire
Law Offices of Dawn V. Martin
1725 I Street, N.W., Suite 300
(202) 408-7040/(703) 440-1417
dvmartinlaw@yahoo.com
www.dvmartinlaw.com

57

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   this brief contains <u>13,759</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   this brief has been prepared in a proportional spaced typeface using <u>Microsoft Word</u> in <u>14 point Times New Roman</u>.

<u>/s/ Dawn V. Martin        </u>
Dawn V. Martin, Esquire

Dated:  March 4, 2013

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on March 4, 2013, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF System, which will send notice of such

filing to the following registered CM/ECF users:

Susan F. Earman  
Friedlander, Friedlander  
  & Earman, PC  
1364 Beverly Road  
Suite 201  
McLean, VA 22101  
(703) 893-9600

Mikhael D.Charnoff  
Perry Charnoff PLLC  
2300 Wilson Boulevard  
Suite 240  
Arlington, VA 22201  
(703) 291-6650

*Counsel for Appellee*  
*Bromdum*

*Counsel for Appellees*  
*Long and Foster Real Estate, Inc., et al.*

The necessary filing and service were performed in accordance with the

instructions given to me by counsel in this case.

/s/ Melissa A. Dockery  
Melissa A. Dockery  
Gibson Moore Appellate Services  
421 East Franklin Street  
Suite 230  
Richmond, VA  23219

# ADDENDUM

## TEXT OF STATUTES AND REGULATIONS

## STATUTES

1) The Civil Rights Act of 1964, 42 U.S.C. §§ 3601-3619, commonly known

as "The Fair Housing Act" particularly the following sections.

§3604(a, which makes it unlawful to

... refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color ... or national origin.

§3604(d), which makes it unlawful

...  to represent to any person because of race, color ... or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

2)  The Virginia Human Rights Act, Virginia Code Chapter 39. 2.2-3900A.

§ 2.2-3901. Unlawful discriminatory practice and gender discrimination defined.
Conduct that violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, or disability shall be an "unlawful discriminatory practice" for the purposes of this chapter.